Clinton Roy **PETRIE**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 21512.

United States Court of Appeals Ninth Circuit.

In Banc.

Feb. 12, 1969.

268

J. B. Tietz (argued), Los Angeles, Cal., for appellant.

Craig B. Jorgensen (argued), Asst. U. S. Atty., Matthew Byrne, Jr., U. S.

Atty., Robert L. Brosio, Asst. U. S. Atty., Crim. Div., Los Angeles, Cal., for appellee.

Before CHAMBERS, BARNES, HAMLEY, MERRILL, KOELSCH, BROWNING, DUNIWAY, ELY, CARTER and HUFSTEDLER, Circuit Judges.

ELY, Circuit Judge:

Appellant Petrie was convicted in the District Court for violation of the Universal Military Training and Service Act, 50 U.S.C. App. § 462. He appeals, invoking the jurisdiction conferred upon us by 28 U.S.C. §§ 1291, 1294.

On October 31, 1960, Petrie registered with Local Board No. 82, North Hollywood, California. On July 16, 1963, the local board received from him a Classification Questionnaire (SSS Form No. 100). In his answers to this questionnaire, Petrie claimed to be a conscientious objector and to have been a minister of Jehovah's Witnesses since June 1954. He did not list any dependents but did indicate that he had been employed for one month as an aircraft landing field employee.

On August 5, 1963, the local board received from Petrie a completed Special Form for Conscientious Objector (SSS Form No. 150), wherein Petrie again claimed to be a conscientious objector. On November 6, 1963, however, the local board classified Petrie as available for military service (class I–A). Petrie promptly appealed this classification, and ultimately, on June 24, 1965, the appeal board classified him as a conscientious objector available for civilian work contributing to the maintenance of the national health, safety, or interest (class I–O).

During the period when his administrative appeal was pending, Petrie supplied the local board with a substantial amount of additional information relating to his classification status. Following his receipt of an order to report for an armed services physical examination, Petrie, on December 29, 1964, mailed a letter to the local board informing it that his father had been killed in a plane crash on December 10, 1964. He further informed the board that his father had left over a quarter of a million dollars in debts, that he was then the only means of support for his mother, and that he was attempting to obtain a commercial pilot's license, which he expected to receive in three or four weeks. On the basis of these facts, Petrie requested a reclassification of his draft status. In response, the local board notified Petrie that it was in receipt of the information and that it warranted "reconsideration" of his selective service status. Soon thereafter, however, the board informed Petrie that no decision would be made upon his request until the appeal board had decided the outcome of his pending appeal concerning his claim to be a conscientious objector.

On January 22, 1965, Petrie again wrote the local board, requesting a III–A classification due to hardship. He stated not only that he supported his mother, but also that he contributed to the support of his grandmother. He also stated that he was at that time preparing to obtain a flight instructor's rating. The local board notified Petrie that no action would be taken on his request for a hardship classification until his earlier appeal had been resolved.

On February 2, 1965, the local board received a letter from Valley Pilots Flying Service explaining that Petrie was at that time taking "extensive training * * * in preparation for his commercial and instructor's ratings." On March 10, 1965, Valley Pilots Flying Service further informed the board that it was expected that Petrie would complete the course for a flight instructor's license by May 9, 1965. On May 3, 1965, Petrie reported for his armed services physical examination and was found acceptable.

As indicated previously, on June 24, 1965, Petrie was placed in class I–O by the appeal board. Thereafter, the local board requested that Petrie complete and return a Dependency Questionnaire (SSS Form No. 118). This form, received by

the board on July 6, 1965, revealed that Petrie was then employed as a flight instructor and was earning $140.00 per week. Petrie listed his mother as being wholly or partially dependent upon him for support and stated that he contributed $450.00 per month for her support.[1] On July 12, 1965, the board notified Petrie that "the facts presented do not warrant the reopening or reclassification of your case at this time."

Following this decision, the board received a letter from an attorney whom Petrie had employed. The letter stated that Petrie would soon thereafter file new materials in support of his claims and would make a formal request for reopening of his classification. On August 2, 1965, another letter from the attorney arrived, accompanied by several letters and other documents. In one letter, Petrie's mother expanded upon the previous information which he had supplied in regard to the fact that his mother and grandmother were dependent upon him. The mother explained, among other things, that the insurance money received following her husband's death had been used to pay off a number of expenses and debts and to finance Petrie's flight education. Petrie's mother also stated that she was earning about sixty dollars per month as a voice teacher and

that Petrie's grandmother was living with her. Other letters accompanying the attorney's cover letter revealed that there were no assets in Petrie's father's estate, that Petrie had been employed by the Valley Pilots Flying Service as a full-time flight instructor since April 1, 1965, and that Petrie was currently completing a course of instruction leading to a rating for helicopter instruction.

On October 27, 1965, the board received two additional letters from the Valley Pilots Flying Service. These letters recited that Petrie was employed by Valley Pilots as a flight instructor and that his services were extremely valuable to that organization.[2] On November 3, 1965, Petrie met with the local board and submitted thirty additional letters written in support of his deferment claims by persons acquainted with him and his family. Additionally, on that date letters were received from Petrie, his mother, and Valley Pilots Flying Service. Following a meeting with Petrie, however, the local board determined that his classification was proper, and on November 4, 1966, the board notified Petrie and the other interested parties that the board was of the opinion "that the facts presented do not warrant the reopening of the registrant's classification."

1. Petrie made the following statement: "I am the only member of my mother's family that is in a position to support her. She has no substantial trade or skill which would adequately support her. Her health and age would not enable her to get any employment; menial or otherwise. She has arthritis and depends almost entirely on my support and my ability to make a home for her."
Similarly, Petrie's mother stated: "I am unable to work not only because of the reasons stated above, but also because my 87 year old mother lives with us and because of her age and senility as well as a semi-invalid condition she demands my care and can't be left alone. She is on G.A.S. but is sometimes an extra expense to us as well. My son is our only protection and means of transportation, as I do not drive. He has to get her to the doctor and help me shop etc."

2. One of these letters, dated October 25, 1965, and signed by a person presumably connected with Valley Pilots Flying Service, stated as follows:
"TO WHOM IT MAY CONCERN:
"Mr. Clinton R. Petrie has been employed as a Flight Instructor with Multi-Engine and Instrument Ratings, by Valley Pilots Flying Service, for over a year.
"He is a valued employee, and much in demand by his students. He is a very competent Flight Instructor and it would be a great loss to our organization to have him drafted at this time—he is also completing his Helicopter Ratings, and as such, would be the only employee that we would have who could instruct in Helicopters.
"Anything that can be done to keep him from being drafted for a year or more, would be greatly appreciated."

The foregoing recitation embraces all the facts which are necessary to an understanding of the disposition to be made on this appeal. Other facts are set forth in the margin.[3]

Petrie contends that the District Court erred in denying his Motion for Judgment of Acquittal.

■ It is appropriate first to dispose of the contention that "the appeal board improperly classified appellant I–O in June, 1965, because the local board failed to notify * * * [the appeal board] of the intervening facts that removed appellant from consideration for Class I–O and entitled him to classification in Class III–A." Since the appeal board would have been precluded from considering any such additional information outside the record forwarded to it at the time of the appeal, this contention is devoid of merit. 32 C.F.R. §§ 1626.14, 1626.24(b).

■ Petrie also contends that he was denied due process of law in that the board refused to reopen his classification after a "de facto reopening" had occurred on December 31, 1964. This con-

---

3. On July 12, 1965, contemporaneously with the denial of Petrie's first request for reopening and reclassification, the board had mailed to Petrie a special form for conscientious objectors requesting that he submit three types of appropriate civilian work which he would perform in satisfaction of his duties under the Act. 50 U.S.C. App. § 456(j) ; see 32 C.F.R. § 1660.20. This form was not returned to the board, and the board therefore requested that the State Director of Selective Service forward three types of available, appropriate employment, which could then be submitted to Petrie. On August 13, 1965, the office of the State Director replied, in part, as follows :

"The following three types of civilian work which have been approved are available for Class I-O registrants at the present time :
"Institutional helper, Los Angeles County Department of Charities, 1200 North State Street, Los Angeles, California 90033. Salary $10.72 for an 8-hour day based on a 40-hour week.
"Truck driver helper, Goodwill Industries, 342 San Fernando Road, Los Angeles, California. Salary $125.00 to $150.00 a month for a 40-hour week.
"Psychiatric technician trainee, Atascadero State Hospital, Atascadero, California. Salary $255.00 to $281.00 per month for a 40-hour work week.
"If the registrant comes in to your board it is suggested that you also show him Memorandum No. 209 which sets forth all the various types of approved work in the State of California."
On August 17, 1965, the local board mailed to Petrie a letter listing the foregoing three available, appropriate jobs and requesting that he inform the board of his preference among them. The local board did not, however, receive a reply to this letter, and on October 22, 1965, the board requested that Petrie appear at a scheduled meeting with a representative of the State Director in order to reach an agreement as to the civilian work which Petrie would perform in lieu of service in the armed forces. At this meeting, which, as previously indicated, occurred on November 3, 1965, Petrie indicated that he was then earning $600.00 per month as a flight instructor and that "due to financial reasons I cannot accept any of those jobs with that pay * * *." (This quotation is taken from a copy of the board's notes of its interview with Petrie.) Therefore, after Petrie had stated that he would not accept any of the jobs offered, and in view of the fact that he had submitted no jobs of his own choice, the board decided that employment as an institutional helper at the Los Angeles County General Hospital, a facility of the Los Angeles Department of Charities, was available and appropriate. The board then requested the State Director to approve and authorize this selection of civilian employment to be performed by Petrie, and on November 29, 1965, such authorization was received by the board. This selection was also approved by the National Director of the Selective Service system. Thereafter, on December 7, 1965, a form was mailed by the board to Petrie ordering him to appear at the board for instructions on December 20, 1965. On that date Petrie did appear and was instructed to report to the office of the Department of Charities for civilian work by the following day. Petrie reported to the Department of Charities as ordered, but he refused all work assignments of any sort. Thereafter, Petrie made no attempt to obtain other appropriate civilian work.

tention is based upon the fact that on that date, following Petrie's notification to the board of his father's death, a clerk of the board had sent Petrie a form letter stating in part that "[w]e are in receipt of information which warrants reconsideration of your Selective Service status by this Local Board * * *." [4] As noted previously, soon after this letter was sent, the board had again written Petrie, stating that the board had considered his request and had determined that "no decision will be made on your request until your appeal has been resolved on your conscientious objection claim * * *." In view of these facts, it is manifest that no reopening, "de facto" or otherwise, of Petrie's classification occurred during this period of time. *See* 32 C.F.R. §§ 1625.4, 1625:11–13. The mere use of the word "reconsideration" in the letter from the local board cannot change this conclusion, particularly where, as here, there was no reliance, to his detriment, on Petrie's part. We turn, therefore, to Petrie's contention that, assuming the truth of the facts presented to the local board, the decision not to reopen his classification was improper.

The applicable Selective Service Regulations provide as follows:

"The local board may reopen and consider anew the classification of a registrant (a) upon the written request of the registrant, the government appeal agent, any person who claims to be a dependent of the registrant, or any person who has on file a written request for the current deferment of the registrant in a case involving occupational deferment, if such request is accompanied by written information presenting facts not considered when the registrant was classified, which, if true, would justify a change in the registrant's classification * * *."

32 C.F.R. § 1625.2.

"When a registrant, any person who claims to be a dependent of a registrant, any person who has on file a written request for the current deferment of the registrant in a case involving occupational deferment, or the government appeal agent files with the local board a written request to reopen and consider anew the registrant's classification and the local board is of the opinion that the information accompanying such request fails to present any facts in addition to those considered when the registrant was classified or, even if new facts are presented, the local board is of the opinion that such facts, if true, would not justify a change in such registrant's classification, it shall not reopen the registrant's classification."

32 C.F.R. § 1625.4. The essential question, therefore, is whether Petrie presented to the local board, in writing, facts "which, if true, would justify a change" in his classification.

■ Our scope of review as to actions of the local board is well defined. However strongly we may disagree with the appropriateness of an action taken by the local board, we may overturn that action only if it has "no basis in fact." Estep v. United States, 327 U.S. 114, 122, 66 S.Ct. 423, 90 L.Ed. 567 (1946); *see* Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955); Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953). While in most cases the "basis in fact" test is applied to the final classification action of the local board, it is equally applicable to a refusal by the board to reopen

---

4. This letter continued, " * * * therefore, this is to advise that your Order to Report for Armed Forces Physical Examination * * * is hereby canceled." The only notation for December 31, 1964, in the minutes of the local board is that on that date Petrie's order to report for a physical examination was canceled. As noted previously, Petrie's letter informing the board of his father's death was evidently written in response to the board's order that he report for a physical examination.

the registrant's classification.[5] United States v. Ransom, 223 F.2d 15 (7th Cir. 1955); *accord,* Stain v. United States, 235 F.2d 339, 343 (9th Cir. 1956); United States v. Burlich, 257 F.Supp. 906, 911 (S.D.N.Y. 1966); United States v. Majher, 250 F.Supp. 106, 110 (S.D. W.Va.1966); *see* Klubnikin v. United States, 227 F.2d 87, 89 (9th Cir. 1955), *cert. denied,* 350 U.S. 975, 76 S.Ct. 453, 100 L.Ed. 846 (1965); *cf.* United States v. Ruppell, 278 F.Supp. 287, 290 (E.D. N.Y. 1968). Judge Hamley of our court has expressed the rule concisely: "Refusal of a local board to reopen on the ground that the newly-asserted facts would not justify a change in classification may be set aside if such refusal has no basis in fact." Woo v. United States, 350 F.2d 992, 996 (9th Cir. 1965) (Hamley, J., dissenting on other grounds).

This definition of our scope of review over the local board's refusal to reopen a registrant's classification is also in accord with our recent decision in Miller v. United States, 388 F.2d 973 (9th Cir. 1967). There the official minutes of the local board made it apparent that

"[t]he local board did not deal with the alleged facts or evidence of appellant's conscientious objector form as a question of whether this legally could provide basis for a reopening to be made, so as to entitle consideration and evaluation to be engaged in thereafter under the general classification procedure of the regulations. It shortcut the situation by directly proceeding, without purporting to reopen, to a consideration of whether appellant was entitled to a conscientious objector classification on the merits of the probative elements of its file. It weighed the information contained in appellant's form against other probative factors * * * and arrived at the judgment that he was not in truth a conscientious objector but was merely 'seeking to avoid induction.'

"This was action amounting to a determination of the question of classification."

Miller v. United States, 388 F.2d at 976. As the quoted statement indicates and as the court explained,[6] *Miller* is premised on the rationale that the local board followed an improper procedure in reviewing the registrant's request by

5. The Universal Military Training and Service Act makes no provision for judicial review of the actions of local boards, and, in fact, the statute provides that "[t]he decisions of such local boards shall be final * * *." 50 U.S.C. App. § 460(b) (3). The primary concern of the Supreme Court in *Estep* was to determine whether that statutory provision excluded all judicial review of actions taken by a local board. The Court concluded that local board actions could be properly reviewed to the extent that the reviewing court limited itself to a determination of whether the board exceeded jurisdiction granted to it by the statutes and Regulations.
"The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. * * * The decisions of the local boards made in conformity with the regulations are final even though they may be erron-

eous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant."
Estep v. United States, 327 U.S. 114, 122–23, 66 S.Ct. 423, 427, 90 L.Ed. 567 (1946). Although the Court was concerned in *Estep* with a classification decision made by a local board, in earlier discussion in the opinion the Court clearly indicated that a refusal to reopen was another example of an action wherein the board's jurisdiction might be exceeded. 327 U.S. at 121.

6. The court explained:
"We do not believe that such a power, to engage in a general consideration and evaluation and then to accord the result a summary status only, can be harmonized with the provisions and purposes of §§ 1625.2 and 1625.11. But if such an implied power can be regarded as being intended to exist under the regulations, then it must be held, we think, that the discrimination which the board effects against a conscientious

means of inapplicable standards, thereby violating a procedural right which the *Miller* court, under the facts before it, equated with infringement of the right of due process. Thus the court concluded: "The test of whether an administrative result has a basis in fact cannot be given application to sustain a result which has been arrived at by invalid procedural processes." 388 F.2d at 977. In *Miller*, therefore, the court did not reach the issue of whether there was basis in fact to support the refusal to reopen.[7] Here, however, we are directly confronted with the problem of whether or not the board erred in concluding that the registrant had failed to present to the board facts "which, if true, would justify a change" in his classification.[8]

██ As applied to an action of the local board in refusing to reopen a classification pursuant to a registrant's request, the basis in fact test is substantially different in degree from that applied to the board's final classification decision. As to the latter action, basis in fact consists of "some proof"—something which may be less than substantial evidence—to support the *evaluative classification decision*. Dickinson v. United States, 346 U.S. 389, 396, 74 S.Ct. 152, 98 L.Ed. 132 (1953). In comparison, the Regulations governing reopening, quoted *supra*, have been construed to require only that the registrant present to the local board a "prima facie case" supporting his request for placement in another classification. *E. g.*, Stain v. United States, 235 F.2d 339, 342 (9th Cir. 1956). Thus, "refusal to reopen has no basis in fact if the written request to reopen sets forth a prima facie case for reclassification and if it contains some allegations of fact in addition to those considered when the registrant was originally classified." Woo v. United States, 350 F.2d 992, 997 (9th Cir. 1965) (Hamley, J., dissenting on other grounds).

objector claimant by dealing with his situation on this basis, as opposed to another such claimant of similar prima facie situation to whom it accords a reopening, would be a violation of the due process clause of the Fifth Amendment.

"In the latter situation, a conscientious objector claimant would be left with the procedural rights to appear, be heard, and take an appeal, while in the first situation there would be a foreclosure of these substantial incidents to a similar claimant. For a local board to be able to effect a discrimination of such substance between prima facie situations of legal equality facially would seem to us to constitute a matter of basic unfairness and hence to be, in the language of Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884, and Schneider v. Rusk, 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed. 2d 218, 'so unjustifiable as to be violative of due process'."

388 F.2d at 976–977. Furthermore, in the concluding part of the opinion, our court wrote:

"At all events, we believe that it would constitute a violation of due process for a local board to be able to handle prima-facie conscientious-objector claims in such different modes as to deprive one claimant of the statutory right of ap-

peal (as well as the regulational rights of appearing and being heard) and to leave another claimant with these incidents."

388 F.2d at 977.

7. The Government contended in *Miller* that since there was evidence in the registrant's record which would have constituted sufficient basis in fact to support a classification other than that requested by the registrant, the board's decision not to reopen should have been upheld. The *Miller* court correctly decided that this contention could not be upheld, since, as discussed *infra*, its acceptance would, in effect, deprive the registrant of his rights to take an administrative appeal from a classification decision.

Equally unmeritorious is Petrie's contention here that *Miller* held generally that "the no-basis-in-fact doctrine is not applicable to a reopening situation * * *."

8. The record before us does not include, as it did in *Miller*, official notes of the local board's deliberations with regard to the registrant's request for reopening and reclassification. As noted previously, in *Miller* such notes made it manifest that the board had not afforded the registrant the procedural rights required by the Regulations.

Few courts have attempted to define that which was meant by the *Stain* court when it employed the term "prima facie case." One District Court explained that "[t]he Board is mandated into at least looking at the facts as stated, considering whether it has previously known those facts when its prior classification was made and considering whether the facts stated, if true, would, to *any* reasonable mind, justify a reclassification." United States v. Longworth, 269 F.Supp. 971, 974 (S.D. Ohio 1967) (emphasis in original). While our court recently indicated in *Miller,* discussed *supra,* that when the new information received must be "weighed * * * against other probative factors," then a reopening is necessary, Miller v. United States, 388 F. 2d at 976, this suggestion does not mean that the board is required to reopen when all reasonable men would agree that the new claim was frivolous or that the alleged facts would not justify reclassification.

Although it might be properly determined in reopened proceedings that the registrant was not entitled to placement in the newly requested classification, the registrant's right to a reopening is not an insignificant right. The Regulations provide no means for administrative review of a local board's decision not to reopen a registrant's classification. *E. g.,* Stain v. United States, 235 F.2d 339, 343 (9th Cir. 1956). In contrast, "[w]hen the local board reopens the registrant's classification, it shall consider the new information which it has received and shall again classify the registrant in the same manner as if he had never before been classified." 32 C.F.R. § 1625.11. The Regulations specifically grant to the registrant the right thereafter to take his case to the appeal board. 32 C.F.R. § 1625.13. The registrant's important right to administrative review of the local board's *evaluative* decisions is thereby expressly preserved. These are the reasons which make it obligatory for the board to reopen upon the presentation of a prima facie showing.

We now turn to the question of whether there was basis in fact to support the board's determination that Petrie did not present a prima facie case to the board —that is, that he did not present facts "which, if true, would justify a change" in his classification to either class II–A, class II–S, or class III–A.

## THE II–A CLAIM

The Selective Service Regulations provide that "[i]n Class II–A shall be placed any registrant whose employment in industry, or other occupation or employment, * * * is found to be necessary to the maintenance of the national health, safety, or interest." 32 C.F.R. § 162.22(a). Additionally, the Regulations provide that

"a registrant's employment in industry or other occupation * * * shall be considered to be necessary to the maintenance of the national health, safety, or interest only when all of the following conditions exist:

"(1) The registrant is, or but for a seasonal or temporary interruption would be, engaged in such activity.

"(2) The registrant cannot be replaced because of a shortage of persons with his qualifications or skill in such activity.

"(3) The removal of the registrant would cause a material loss of effectiveness in such activity."

32 C.F.R. § 1622.23(a). Eligibility for the II–A classification requires, therefore, not only that the essential character of the occupation be such as to make it "necessary to the maintenance of the national health, safety, or interest," but also that the three enumerated conditions, relating to the employment of the specific registrant, be present.

The information presented to the board was generally that Petrie was employed by the Valley Pilots Flying Service as a flight instructor, that he was a "valued employee," and that his being

drafted would result in "great loss" to the company. This was not enough. Clearly, there was basis in fact for a determination that Petrie did not. make a prima facie showing as to the second of the enumerated conditions, namely, that he could not be replaced as a flight instructor. In fact, no information relating directly to that fact was presented to the board. Both the Flying Service and Petrie represented to the board that, once Petrie had obtained his rating as a helicopter instructor, which he was expected to obtain by the end of November 1965, he would become irreplaceable since he would be the only employee of the Flying Service capable of both ordinary flight and helicopter instruction. Assuming that such a combination of skills in one person would in fact have established that Petrie would be irreplaceable by his employer, the local board was not required to reopen and consider Petrie's new request for II–A classification when it was apparent that one of the prescribed conditions did not then exist and would come about, if at all, at some future time. Thus, although it may have been within the discretionary power of the local board to reopen on the basis of the asserted facts as to Petrie's occupation, we hold that there was basis in fact for the conclusion that Petrie had failed to make the required prima facie showing in regard to his II–A claim.[9]

## THE II–S CLAIM

At the relevant time, section 1622.25 (a) of the Regulations provided that "[i]n Class II–S shall be placed any registrant whose activity in study is found to be necessary to the maintenance of the national health, safety, or interest." E.O. 10984, 27 Fed.Reg. 194 (1962). Petrie contends that, at the time of the board's second refusal to reopen, on November 4, 1965, he qualified for a deferment under this provision because of his part-time course in helicopter instruction.[10] Because of the particular nature of Petrie's activity in this connection, and in view of its part-time character, the crucial issue regarding establishment of a prima facie II–S case by Petrie involves the meaning in the Regulation of "activity in study" by a registrant. Unlike the Regulation concerning II–A deferments, the II–S Regulation did not, during the relevant time period, expand upon the meaning of any of the required conditions, other than to include as part of section 1622.25 the following provision:

"(b) The Director of Selective Service, after consultation with such departments and other agencies of the executive branch of the Government as may be appropriate, may promulgate criteria, which shall be advisory only, concerning the placing of registrants in Class II–S."

E.O. 10984, 27 Fed.Reg. 194 (1962). This latter provision was placed in the II–S Regulation in 1962. Prior to this 1962 amendment, subsection (b) had provided in part as follows: "A registrant's activity in study may be considered to be necessary to the maintenance

---

9. In view of this conclusion, we need not consider whether Petrie also made a prima facie showing that the essential character of the occupation itself was "necessary to the maintenance of the national health, safety, or interest." Quite obviously, there are situations wherein the employment of a particular registrant would meet the three enumerated conditions, but wherein it would also be clear, without the necessity for evaluative consideration, that the occupation was not a "necessary" one. In such a case, there would exist the necessary basis in fact to support refusal to reopen.

10. Petrie originally requested a II-S deferment based upon a course of study for a flight instructor's rating. At the beginning of July 1965, however, when the local board for the first time considered reopening Petrie's classification, following the action of the appeal board, the representations of Petrie disclosed that he had already completed his course of study for a flight instructor's rating. At that time, therefore, Petrie was no longer engaged in any type of study, and the board properly refused to reopen for the purpose of considering that particular II-S claim.

of the national health, safety, or interest when any of the following conditions exist * * *." E.O. 10292, 16 Fed.Reg. 9862 (1951). The latter Regulation, as it was originally promulgated in 1951, thereby establishing *for the first time* the II–S deferment, is set out in the margin along with typical parts of these "following conditions." [11] As the terms of all these conditions make abundantly clear, "activity in study"—as it was originally defined—was confined to full-time courses of instruction in a college, university, or similar institution of learning.

As stated above, the subsection of the Regulation containing these specific conditions was amended in 1962 so as to place the responsibility for issuing appropriate criteria directly in the hands of the Director of Selective Service. Since it was provided that such criteria were to be advisory only, it seems apparent that the 1962 amendment was designed not only to place the responsibility for establishing workable and appropriate criteria upon those with administrative expertise in the area, but also to afford greater flexibility and discretion to the local board. It is also apparent that the amendment was *not* intended to accomplish any significant change in the long-established meaning of "activity in study" by a registrant. This conclusion is supported by the fact that when, in March 1966, subsequent to the board's refusal to reopen Petrie's case, the Director of Selective Service for the first time promulgated advisory criteria pursuant to the 1962 amend-

---

11. "§ 1622.25 Class II–S: Registrant deferred because of activity in study. (a) In Class II–S shall be placed any registrant whose activity in study is found to be necessary to the maintenance of the national health, safety, or interest.

"(b) A registrant's activity in study may be considered to be necessary to the maintenance of the national health, safety, or interest when any of the following conditions exist:

\* \* \* \* \*

"(3) The registrant (i) has been accepted after July 1, 1951, for admission by a graduate school to the class next commencing for a full-time course of instruction as a candidate for a graduate degree and, if such class has commenced, has entered upon such course, and (ii) in his last full-time undergraduate academic year at a college, university, or similar institution of learning achieved a scholastic standing on that year's work which ranked him for that year within the upper one-half of the full-time male students in his class or has attained a score of 75 or more on the qualification test prescribed by the Director of Selective Service pursuant to paragraph (c) of this section, and (iii) the graduate school at which he is in attendance has certified that he currently is meeting degree requirements and is expected to attain his degree."

\* \* \* \* \*

"(6) The registrant has successfully completed his third year at a college, university, or similar institution of learning and achieved a scholastic standing on his third year's work which ranked him for that year within the upper three-fourths of the full-time male students in his class or has attained a score of 70 or more on the qualification test referred to in subparagraph (3) of this paragraph, and has been accepted for admission by a college, university, or similar institution of learning to the fourth-year class next commencing for a full-time course of instruction or has entered upon and is satisfactorily pursuing such course."

\* \* \* \* \*

"(8) The registrant has successfully completed his first year at a college, university, or similar institution of learning and achieved a scholastic standing on his first year's work which ranked him for that year within the upper one-half of the full-time male students in his class or has attained a score of 70 or more on the qualification test referred to in subparagraph (3) of this paragraph, and has been accepted for admission by a college, university, or similar institution of learning to the second-year class next commencing for a full-time course of instruction or has entered upon and is satisfactorily pursuing such course."

"(c) The Director of Selective Service is authorized to prescribe such qualification test or tests as he may deem necessary for carrying out the provisions of paragraph (b) of this section * * *." E.O. 10292, 16 Fed.Reg. 9843 (1951).

These conditions were amended in several minor respects in 1954. E.O. 10562, 19 Fed.Reg. 6705 (1954).

ment, the criteria were identical to the provisions which had been present in the Regulations prior to 1962. See note 11, *supra.* Subsequently, in July 1967, section 1622.25 was completely revised by Executive Order so as to provide that "[i]n Class II–S shall be placed any registrant who has requested such deferment and who is satisfactorily pursuing a full-time course of instruction at a college, university, or similar institution of learning * * *." 32 C.F.R. § 1622.25(a) E.O. 11360, 32 Fed.Reg. 9790 (1967).

■ Therefore, in light of the history of the II–S Regulation from 1951 through 1962, and in view of the fact that the 1962 amendment was clearly not intended to alter the basic meaning of "activity in study," we hold that, in order to have established a prima facie case for a II–S deferment, it was necessary for Petrie to present facts placing him generally within the scope of a student pursuing a full-time course of instruction at a college, university, or similar institution of learning. As Petrie himself revealed on the face of his request, his activity was not within that area. He therefore failed to make out such a sufficient prima facie showing as would have required the board to reopen and consider the claim for a II–S deferment.[12]

## THE III–A CLAIM

The Selective Service Regulations provide that "[i]n Class III-A shall be placed any registrant whose induction into the armed forces would result in extreme hardship * * * to his * * parent [or] grandparent * * * who is dependent upon him for support * *." 32 C.F.R. § 1622.30(b) The facts presented by Petrie concerning his III-A

claim have been related previously. Apart from the existence of the special circumstances discussed *infra,* we are convinced that by the presentation of these facts Petrie made out a prima facie case of his entitlement to such a classification. Although there were facts shown by the record, which might have constituted sufficient basis to support a *classification* decision rejecting the claim for III-A deferment, these particular facts were such that their consideration could not properly have occurred until the *evaluation stage* of the classification process. Therefore, they could not operate to destroy Petrie's right to the reopening to which he was entitled.

It may be argued that, despite Petrie's showing, the local board was justified in refusing to reopen his classification because of the legal consequences of other circumstances peculiar to Petrie's case. First, there is the question of whether Petrie waived his claim to III-A status because he failed to report his change of dependency status to the local board within the required period of time. Secondly, the Government contends that a registrant already classified as a conscientious objector, as was Petrie at the time of the two refusals to reopen, is, for that reason, not be entitled to a III-A "hardship" deferment.

It is provided in the Selective Service Regulations that "[e]ach classified registrant * * * shall, within 10 days after it occurs, report to the local board in writing any fact that might result in the registrant being placed in a different classification such as, but not limited to, any change in his * * * dependency status * * *." 32 C.F.R. § 1625.1 (b). In Williams v. United States, 203 F.2d 85, 88 (9th Cir.), cert. denied, 345 U.S. 1003, 73 S.Ct. 1149, 97 L.Ed. 1408 (1953), our court held that a "[r]egis-

12. On November 3, 1965, the date of the board's second decision not to reopen Petrie's classification, Petrie notified the board that he would obtain his instructor's rating for helicopters by the end of that same month. Here again, we need not consider the government's contention that any error in this regard was non-

prejudicial. See Yaich v. United States, 283 F.2d 613 (9th Cir. 1960). Nor need we consider whether the board might properly have concluded that in no event would Petrie be called for service before that date of completion and that, therefore, Petrie's request for a II-S deferment was moot. Cf. 32 C.F.R. § 1622.21(c).

trant's failure to notify the local Board of *his change in* \* \* \* *status* within the time allowed constituted a waiver of any claim for deferment on the basis of such change in status." The Second Circuit has expressed doubt concerning the broad scope of the rule as stated in *Williams*,[13] and we would be reluctant to say that the rule must always be held to be absolute. Even when a registrant has failed to appeal a classification decision within the required time, that failure has been held excusable in the rare case wherein exceptional circumstances are present. Donato v. United States, 302 F. 2d 468 (9th Cir. 1962), cert. denied, 374 U.S. 828, 83 S.Ct. 1868, 10 L.Ed.2d 1052 (1963). In the instant case, it should be noted that the local board supplied no indication, upon the record, that the registrant's delay was a reason, either principal or contributive, for its decision. Cf. United States v. Vincelli, 215 F.2d 210, 213 (2d Cir. 1954).

■ As we have seen, Petrie's father died on December 10, 1964, and it was not until nineteen days later that Petrie mailed the letter by which the board was informed of the change in circumstances. In a supplemental brief, the Government concedes that "under the circumstances of this case, it appears that the registrant advises [*sic*] the board of the change in circumstances within a reasonable time; therefore, the government does not rely upon the registrant's failure to comply with the regulation in this case." In light of this concession, and in view of the fact that the record contains no indication that the local board relied upon, or even considered, Petrie's delay as a possible basis for its refusal to reopen, we hold that Petrie did not, because of the delay, waive his right to the board's

consideration of his claim to III-A "hardship" status.

The Government's contention that Petrie was not eligible for III-A status because of the fact that he was already classified as a conscientious objector is based upon our court's holding in Klubnikin v. United States, 227 F.2d 87, 89 (9th Cir. 1955), cert. denied, 350 U.S. 975, 76 S.Ct. 453, 100 L.Ed. 846 (1956). In *Klubnikin* the court first pointed out that section 1622.30(b), which established the scope of the III-A classification, "applies only to persons 'whose induction into the armed forces would result in extreme hardship and privation \* \*.'" 227 F.2d at 89. Therefore, reasoning that "the hardship deferment is a deferment from *military service*" the court concluded:

> "Klubnikin was a recognized conscientious objector with a I-O classification, and as long as he remained so classified, could not be inducted into the armed forces. If he could not be inducted into the armed forces then a claim for a classification because of hardship which would result solely from such induction was without merit."

227 F.2d at 89 (emphasis in original).[14] We no longer agree with that reasoning and have determined that we should not adhere to the holding of the *Klubnikin* court on the particular point under discussion.

The III-A Regulation applies to registrants "whose induction into the armed forces *would* result in extreme hardship \* \* \*." 32 C.F.R. § 1622.30 (b) (emphasis added). As we have previously held herein, Petrie presented facts to the local board which showed, prima facie, that "extreme hardship"

13. "[I]t is doubtful whether \* \* \* [the ten-day provision] would otherwise have been applicable since when it is read, as it should be, with Regulation 1625.1(c) it seems to be intended to apply only to a registrant who has been given a deferred classification and who, because of changes in his situation, is no longer entitled to it, though we need not now

so decide." United States v. Vincelli, 216 F.2d 681, 682 (2d Cir. 1954) (denial of petition for rehearing).

14. We have not discovered a case, nor has our attention been directed to one, in which this holding has been followed or considered since it was announced in 1955.

would have resulted had he been inducted into the armed forces. While Petrie did not make a further showing that he was about to be so inducted or that he was a potential inductee, there is nothing in the Regulations which requires that such a showing be made. The pertinent Regulation specifies an "induction * * * [which] would result in extreme hardship," not an induction which "will" so result. Nor does the Regulation include any other qualifying term or word having the effect of limiting eligibility for a hardship deferment to those persons who are not otherwise exempted or deferred from service in the armed forces. Petrie met, on a prima facie level, the terms of the Regulation: His "induction into the armed forces would result in extreme hardship * * * " [15]

■■■ Our interpretation of this Regulation is supported by two other Regulations involved in Petrie's case. Section 1622.14, defining the conscientious objector classification, provides:

"In Class I–O shall be placed every registrant *who would have been classified in Class I–A* but for the fact that he has been found, by reason of religious training and belief to be conscientiously opposed to participation in war in any form and to be conscientiously opposed to participation in both combatant and non-combatant training and service in the armed forces."

32 C.F.R. § 1622.14 (emphasis added). In view of Petrie's prima facie case for III–A status, we cannot say, and the board could not have known at the time the III–A classification was claimed that he "would have been classified in Class I–A" apart from the fact of his conscientious objection to participation in

war.[16] Secondly, section 1623.2 provides as follows:

"Every registrant shall be placed on Class I–A under the provisions of section 1622.10 of this chapter except that when grounds are established to place a registrant in one or more of the classes listed in the following table, the registrant shall be classified in the lowest class for which he is determined to be eligible, with Class I–A–O considered the highest class and Class I–C considered the lowest class according to the following table:

Class: I–A–O
  I–O
  *   *   *   *   *   *
  II–A
  *   *   *   *   *   *
  II–S
  *   *   *   *   *   *
  III–A
  *   *   *   *   *   *."

32 C.F.R. § 1623.2. Since this Regulation specifically provides that class III–A is a lower classification than class I–O and that a registrant is to be placed in the lowest classification for which he is eligible, our holding that Petrie was "eligible" for placement in class III–A comports with the apparent intent of the order of the listing. The fact that Petrie was also eligible for placement in class I–O should not deprive him of other specified rights. To so hold would be to say, in effect, that his religious beliefs divested him of favorable rights specifically conferred upon others.

"In classifying a registrant there shall be no discrimination for or against him because of his * * * creed * * * or because of his membership or activity in any * * * religious

---

15. Under the compulsion of *Klubnikin*, a I-O registrant, such as Petrie, might report a change in his conscientious objector beliefs, or his surrender of them, prior to, or at the same time as, his reporting of a change to "hardship" dependency status. Thus the registrant would effect his removal from class I-O, and under *Klubnikin*, he would qualify for placement in class III-A.

16. Although we do not believe that the result should depend upon the time of presentation of the III-A claim relative to the registrant's presentation of a conscientious objector claim, we note that the facts supporting Petrie's III-A claim were before the local board at the time of the determination by the appeal board that he qualified as a conscientious objector.

\* \* \* organization. Each such registrant shall receive equal justice." 32 C.F.R. § 1622.1(d).

We conclude that Petrie presented to the local board a prima facie case for entitlement to a III-A classification and that the local board erred in refusing to reopen.

Reversed.