**UNITED STATES of America,
Appellee,**

v.

**Lonnie Leroy HAUGHTON, Appellant.**

**No. 23556.**

United States Court of Appeals
Ninth Circuit.

June 19, 1969.

Rehearing Denied July 23, 1969.

---

4. See 6 Nichols, The Law of Eminent Domain § 27.25[1] (3d ed. 1965).

David R. Hood (argued), Seattle, Wash., for appellant.

J. S. Oberiour (argued), Asst. U. S. Atty., Eugene G. Cushing, U. S. Atty., Tacoma, Wash., for appellee.

Before CHAMBERS and KOELSCH, Circuit Judges, and SOLOMON, District Judge.*

SOLOMON, District Judge:

Lonnie Leroy Haughton appeals his conviction of wilfully refusing to submit to induction into the armed forces, 50 U.S.C. App. § 462.

Haughton's claim for conscientious objector status was rejected by his local board on May 18, 1967. On May 26, Haughton informed the board that he wished to appeal. The regulations required the board to forward Haughton's file to the State Director's office within five days following the thirtieth day after his claim was denied. 32 C.F.R. §§ 1626.13, 1626.14. Washington State Headquarters Memorandum No. 5 (Nov. 4, 1948; amended Dec. 14, 1961). The board properly forwarded the file on June 22, 1967, and on July 6 the State Director's office sent Haughton's file to the appeal board. The appeal board retained Haughton in I–A. On November 7, 1967, Haughton refused to submit to induction.

Haughton first argues that his induction order was invalid because he did not receive a Department of Justice hearing on his conscientious objector claim. Prior to June 30, 1967, the law provided:

"Any person claiming exemption from combatant training and service because of * * * conscientious objections shall, if such claim is not sustained by the local board, be entitled to an appeal to the appropriate

---

* Honorable Gus J. Solomon, United States District Judge, District of Oregon, sitting by designation.

appeal board. Upon the filing of such appeal, the appeal board shall refer any such claim to the Department of Justice for inquiry and hearing. The Department of Justice, after appropriat inquiry, shall hold a hearing with respect to the character and good faith of the objections of the person concerned, and such person shall be notified of the time and place of such hearing." Act of June 24, 1948, ch. 625, § 6, 62 Stat. 609.

The Department of Justice was then required to make recommendations to the appeal board based on its findings.

The Military Selective Service Act of 1967, 50 U.S.C.App. § 456(j), deletes the Department of Justice hearing. Haughton claims that he was entitled to a hearing because the prior law granted one "upon the filing of such appeal" and he filed his appeal on May 26, 1967, more than a month before the new Act took effect. We disagree.

We believe Congress intended that the Department of Justice process only those files actually under investigation on June 30, 1967. Haughton's file did not reach the appeal board until July 6. The House-Senate Conference Report (June 8, 1967) on the 1967 Act states:

> "The conferees have been advised by the Attorney General that there are currently approximately 2,700 conscientious objector cases being processed by the Department of Justice. The House-Senate conferees believe that the processing of these cases should be completed despite the change in the law and advisory opinions referred to the individual appeal boards * * *." U.S.Code Cong. & Admin. News, p. 1360 (1967).

■ Statutes effecting procedural changes, which do not otherwise alter substantive rights, generally are considered immediately applicable to pending cases. Beatty v. United States, 191 F.2d 317 (8th Cir.1951); Hiersche v. Seamless Rubber Co., 225 F.Supp. 682 (D.Or. 1963); Schurgast v. Schumann, 156 Conn. 471, 242 A.2d 695 (1968).

■ The Department of Justice also believed deletion of the hearing requirement applied retroactively. It returned all unprocessed files, including those received prior to July 1, 1967. "When faced with a problem of statutory construction," a court should show "great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). We conclude that Haughton was not entitled to a Department of Justice hearing.

Haughton next claims his local board had no basis in fact to deny his request for a I–O classification. He cites Dickinson v. United States, 346 U.S. 389, 396, 74 S.Ct. 152, 98 L.Ed. 132 (1953), for the proposition that a local board must actually "build a record" supporting its conclusion.[1]

In Parrott v. United States, 370 F.2d 388, 391 (9th Cir.1966), we rejected this interpretation of *Dickinson*. In *Parrott*, we quoted the majority opinion in *Dickinson*:

> "The task of the courts in cases such as this is to search the record for some affirmative evidence to support the local board's overt or implicit finding that a registrant has not painted a complete or accurate picture of his activities." 346 U.S. at 396, 74 S.Ct. at 157.

We interpreted this language to mean that

> "since in *Dickinson* all evidence before the board established the exemption, the registrant had met the statutory criteria, and the board could not, without any contrary evidence, simply say it disbelieved him, 'even in the absence of any impeaching or contradictory evidence.'" 370 F.2d at 391 (quoting *Dickinson* at 396, 74 S.Ct. 152).

---

1. The phrase "build a record" appears in Justice Jackson's dissent in *Dickinson*. 346 U.S. at 399, 74 S.Ct. 152.

*Dickinson* involved a ministerial exemption. Conscientious objection requires a different approach "because the ultimate question * * * is the sincerity of the registrant in objecting, on religious grounds, to participation in war in any form." Witmer v. United States, 348 U.S. 375, 381, 75 S. Ct. 392, 396, 99 L.Ed. 428 (1955). The Sixth Circuit, after reviewing *Witmer* and *Dickinson*, said: "Where, however, the veracity of the registrant is the principal issue, disbelief will suffice. But even in the latter situation, the record must contain some statement of this disbelief if the classification is to be upheld on judicial review." United States v. Washington, 392 F.2d 37, 39 (6th Cir.1968). *See also* Witmer v. United States, at 382, 75 S.Ct. 392; United States v. St. Clair, 293 F.Supp. 337, 341 (E.D.N.Y.1968). Inconsistent statements or actions or a finding of insincerity may support the denial of conscientious objector status. Parrott v. United States, *supra; see* Witmer v. United States at 382, 75 S.Ct. 392. The local board, however, must state the reasons for its denial of a requested classification when a registrant has "met the statutory criteria" (*Parrott, supra,* at 388) for that classification or, in the language of *Dickinson*, has placed himself "prima facie within the statutory exemption." 346 U.S. at 397, 74 S.Ct. at 158.[2] Kessler v. United States, 406 F.2d 151, 156 (5th Cir.1969). Otherwise a court cannot determine whether a board's denial of a requested classification was based on a belief that the registrant's statements, even if true, did not entitle him to the classification, or on the reasonable disbelief of certain allegations necessary to the registrant's *prima facie* case. United States v. Jakobson, 325 F.2d 409, 416–417 (2d Cir. 1963), *aff'd sub nom* United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.

Ed.2d 733 (1965). Shepherd v. United States, 217 F.2d 942 (9th Cir.1954). Batelaan v. United States, 217 F.2d 946 and note 1 (9th Cir.1954). United States v. St. Clair, *supra,* at 344, Cf. Schuman v. United States, 208 F.2d 801, 805 (9th Cir.1953).

We must review Haughton's form 150 in light of these principles and of the Supreme Court's statement in United States v. Seeger, 380 U.S. 163, 184–185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965):

"* * * it must be remembered that in resolving these exemption problems one deals with the beliefs of different individuals who will articulate them in a multitude of ways. In such an intensely personal area, of course, the claim of a registrant that his belief is an essential part of a religious faith must be given great weight. * * * The validity of what he believes cannot be questioned. Some theologians, and indeed some examiners, might be tempted to question the existence of the registrant's 'Supreme Being' or the truth of his concepts. But these are inquiries foreclosed to Government. * * * Local boards and courts in this sense are not free to reject beliefs because they consider them 'incomprehensible.' Their task is to decide whether the beliefs professed by a registrant are sincerely held and whether they are, in his own scheme of things, religious."

Haughton states he believes in a Supreme Being, but his form 150 indicates that he does not believe in an anthropomorphic God.[3] Rather, he believes that "leading [a] religious existence is equivalent to a 'belief in a Supreme Being.'" "Religious" men are those "who direct their whole lives according to the dictates of a goal or belief that they have themselves assumed as

---

2. "Prima facie" is also used in the Selective Service area to mean the information a registrant must allege to require a reopening of his classification. Petrie v. United States, 407 F.2d 267 (9th Cir.

1969); Howze v. United States, 409 F.2d 27 (9th Cir. 1969).

3. Belief in an anthropomorphic God is not necessary. United States v. Seeger, supra at 173–185, 85 S.Ct. 850.

being superior to a common existence." "[L]eading this religious existence necessarily involves 'duties which are superior to those arising from any human relation' " and the "prime duty of a religious individual is to keep himself true to his ideal."

Haughton relates the following training:

"a.  Teaching and training under the Christian faith including Methodist, Baptist, and unorthodox training.

b.  A personal reading of the Old and New Testaments (except for the book of Revelation) of the Holy Bible.

c.  A personal reading of K. Gibran's *The Prophet*.

d.  A personal study of the philosophy of existentialism. * * *

e.  A personal study of Eastern religions, especially Zen Buddhism.

f.  Teaching Sunday School in a Baptist Church."

Haughton lists the following principles drawn from his religious training and belief:

"a.  Reverence for human life as being that form of life which is able to experience spiritual understanding.

b.  A belief that living according to spiritual principles of good is my only way of giving meaning to my experience.

c.  A knowledge that right and wrong is a relative, personal concept for each individual.

d.  A belief that I cannot give myself as a participant in any organization, such as a gang, mob, or the Armed Forces which takes or threatens human life because (1) human life is basically sacred, and (2) participation in any such organization necessarily involves my giving my soul, my individuality, my responsibility to make my own decisions of right and wrong to a soulless, non-thinking machine. I cannot conscientiously participate in such a machine. * * * Any violence that I commit or help commit against any human being must be done at the personal, individual level and must be justified by my spiritual background.

e.  A belief that in today's world we, as humans, must be united in a spirit of communion, understanding, and love. A knowledge that all men are my brothers."

Haughton then mentions additional books and studies that have been the source of his beliefs.

The form 150 contains the question "Under what circumstances, if any, do you believe in the use of force?" Haughton divides force into three categories:

"a.  There is the concept of a *police force* that is formed by a community to protect its citizens from themselves, that is, to *enforce* the community's laws. This concept of course differs from the concept of the role of an army. A police force enforces the laws of a community, in that community, and is given only limited powers in its role. * * * On the other hand, an army has basically unlimited powers, endangers innocent people while it tries [to] punish the 'guilty', and is used not with the consent of one community *in* that community, but is used by one community against another community. A police force is limited to *protecting* the community from a few individuals, an army *punishes* one community on the orders of another. * * *

b.  There is the unlimited concept of force used in war. I have explained my position on this matter. I am against participation in any collective form of force in which a group is used against a group or an individual.

c.  This leaves those types of force in which I myself am singly to use force against another individual. This brings in a relative concept of the use of force because right and wrong is basically relative. I believe that it is morally wrong to commit an act of force or violence against another individual or group *unless* such force or violence is the *sole* method of stopping

said individual or group from committing an act that to me is morally worse than said act of force. For example, I would consider it morally justifiable to shoot a person who was about to kill a friend of mine. But it is not morally justifiable for me to shoot a person whom I discovered stealing from me. Human life is basically sacred, my property is not."

■ These and other responses in Haughton's form 150 indicate that his asserted opposition to participation in war in any form is based on religious training and belief as well as political and moral considerations. One who is entitled to conscientious objector status because of his religious training and belief does not lose that right because political and moral concerns lead him to the same position. Fleming v. United States, 344 F.2d 912 (10th Cir.1965). Otherwise, qualified registrants might have to politically and morally support what they religiously oppose.

Haughton has submitted information to support his claim that he is religiously[4] opposed to participation in war in any form. Several statements in his form 150 test the depth of that claim.

■ Haughton states that "any violence that I commit or help commit against any human being must be done at the personal, individual level and must be justified by my spiritual background." This vague proposition may appear to cast doubt on the legitimacy of Haughton's conscientious objector claim. Haughton explains this statement when he discusses three situations in which force might be used. He states that he accepts the use of force by a community in enforcing its laws because the members of the community consent to this protection. He also accepts the use of force if that is the sole method of stopping an individual from committing a "morally worse * * * act of force" such as murder. But he does not believe in military force by one community which seeks to "punish" the "guilty" in another community. It is the use of force in this third sense that is generally known as "war," and the applicable statute requires conscientious objection to war, not to all uses of force.

■ In United States v. Purvis, 403 F.2d 555, 563 (2d Cir.1968), the Court said:

"Agreement that force can be used to restrain wrongdoing, especially as the last alternative, has little bearing on an attitude toward war. We would not expect a full-fledged conscientious objector to stand by while a madman sprayed Times Square with machine gun bullets or while an assassin took aim at the President."

The defendant in *Purvis* believed in force "if it is used as the only alternative to restrain an individual from doing wrong." In Shepherd v. United States, 217 F.2d 942 (9th Cir.1954), we said that a registrant who believed the Bible permitted him to fight and kill in limited circumstances and who would fight to defend his ministry, his brother Jehovah's Witnesses, his life and property, "did not necessarily negative conscientious objection." 217 F.2d at 945. *Accord:* Blevins v. United States, 217 F.2d 506 (9th Cir. 1954);

4. In Seeger, *supra* at 184, 85 S.Ct. at 863, the Court said:

"In such an intensely personal area, of course, the claim of a registrant that his belief is an essential part of a religious faith must be given great weight. Recognition of this was implicit in this language, cited by [Berman v. United States, 156 F.2d 377, 381 (9th Cir. 1946)] from State v. Amana Society, 132 Iowa 304 [315], 109 N.W. 894 [898] [8 L.R.A.,N.S., 909] (1906):

'Surely a scheme of life designed to obviate [man's inhumanity to man], and by removing temptations, and all the allurements of ambition and avarice, to nurture the virtues of unselfishness, patience, love, and service, ought not to be denounced as not pertaining to religion *when its devotees regard it as an essential tenet of their religious faith.'* * * * (Emphasis by the Court of Appeals.)"

Kessler v. United States, *supra*, at 156; Taffs v. United States, 208 F.2d 329, 331 (8th Cir.1953); United States v. St. Clair, *supra*, at 343–344. In Sicurella v. United States, 348 U.S. 385, 75 S.Ct. 403, 99 L.Ed. 436 (1955), the Court said:

"We believe that Congress had in mind real shooting wars when it referred to participation in war in any form—actual military conflicts between nations of the earth in our time —wars with bombs and bullets, tanks, planes and rockets." 348 U.S. at 391, 75 S.Ct. at 406.

Haughton's willingness to use force to protect the community or to stop another from taking a life is consistent with conscientious objector status.

■ The Government contends that Haughton's beliefs are based on a personal moral code. Haughton frequently refers to morality and the moral foundation of his beliefs. This reference is consistent with a religious motivation. A person understandably uses the language of morality in describing his religious attitudes. A religious man is as likely to say it is "morally" wrong to kill as that it is "religiously" wrong. In United States v. Seeger, *supra*, at 186, 85 S.Ct. at 864, the Court considered the scope of the statutory exception excluding from conscientious objector status those whose objection to war stemmed from a "merely personal moral code":

"We have construed the statutory definition broadly and it follows that any exception to it must be interpreted narrowly. The use by Congress of the words 'merely personal' seems to us to restrict the exception to a moral code which is not only personal but which is the sole basis for the registrant's belief and is in no way related to a Supreme Being."

A registrant who asserts his conscientious objection in terms of a moral imperative will come within the statute if this imperative is not "merely personal" but "occup[ies] the same place in [his] life * * * as an orthodox belief

in God holds in the life of one clearly qualified for exemption." Seeger v. United States, *supra* at 184, 85 S.Ct. at 863. Haughton equates leading a "religious existence" with "belief in a Supreme Being" and he defines "religious" as living "according to the dictates of a goal or belief that [one has] assumed as being superior to a common existence." Haughton then describes the "goal or belief" that he has "assumed." His explanation, if true, shows an orientation to the world and his fellow man which "occup[ies] the same place in [his] life * * * as an orthodox belief in God holds in the life of one clearly qualified for exemption."

■ The Government also contends that Haughton's membership and support of many organizations which are opposed to the war in Vietnam and the draft are inconsistent with a conscientious objector claim. On the contrary, it is predictably consistent that one who religiously opposes participation in war in any form would also oppose a particular war and the method of manpower procurement. Kessler v. United States, *supra*, at 155, United States v. St. Clair, *supra*, at 344.

■ We hold that the allegations in Haughton's form 150 place him "prima facie within the statutory exemption."

In *Seeger*, the Court recognized that "in resolving these exemption problems one deals with the beliefs of different individuals who will articulate them in a multitude of ways." 380 U.S. at 184, 85 S.Ct. at 863. In addition, we are dealing with young people who may not have been required to articulate their beliefs before, or match them to the type of questions in the form 150. These factors make the function of the local board and the reviewing court difficult. Part of this difficulty will be removed if the local board specifies the reasons for its action. A Court can then readily determine the propriety of the action it is asked to review.

■ The local board may have concluded that Haughton was insincere in

his claim, or that Haughton's religious training and beliefs did not, by themselves, lead him to his opposition to war. The board may have relied on information not in the record, contradicting the allegations in Haughton's form 150. Or the board may have erroneously concluded that Haughton's allegations, even if true, did not entitle him to his requested classification. Since the board has not stated the basis for its decision, we cannot determine whether Haughton was properly denied conscientious objector status. United States v. Jakobson, *supra, aff'd sub nom* United States v. Seeger, *supra.*

Reversed.