In the Matter of Petition of William D. SCOTT, Appellant,

v.

COMMANDING OFFICER, Commander Thomas M. Volatile and Secretary of Defense.

No. 18546.

United States Court of Appeals, Third Circuit.

Argued April 10, 1970.

Decided Sept. 15, 1970.

ment for him. The local board denied this request and petitioner's I–A classification was affirmed by the appeal board on July 8, 1969.

While his appeal from the denial of an occupational deferment was pending, petitioner asked the local board to postpone his induction, in the event his appeal was denied, until September 1, 1969. Although he gave no reason for this request, his file reveals that he participated in an extensive tour of Europe during that summer. On August 13, 1969, petitioner was ordered to report for induction on September 18, 1969. Petitioner returned to the United States on August 15, 1969 and found the waiting induction order.

On August 19, 1969 Westinghouse Electric Corporation notified the local board that petitioner had been hired as an associate engineer and asked that his induction be postponed and that he be given an occupational deferment. The board postponed petitioner's induction but on September 18, 1969 decided not to reopen his classification. State Headquarters then reviewed the file at Westinghouse's request but found no cause to intercede. Petitioner's induction was rescheduled and on November 17, 1969 he was ordered to report for induction on December 8, 1969.

Thereafter, on November 25, 1969, petitioner asked that his induction be transferred to the Philadelphia area where he was then residing, and this request was granted on December 1. Also on December 1, petitioner requested the Massachusetts board to send him a conscientious objector form (SSS Form 150), stating that he had become a conscientious objector. The board sent him a Form 150, again postponed his induction, and asked him to come in for a "courtesy interview" on December 11, 1969. Petitioner promptly completed the Form 150 and sent it to the local board,

together with letters from various individuals attesting to the nature and sincerity of his beliefs. On the day after the courtesy interview petitioner was informed by letter that "It was the unanimous opinion of the board that the new information did not warrant reopening of your classification. * * *" No reason was offered why the information submitted did not warrant reopening and none is noted in petitioner's file.

Petitioner's induction was then rescheduled and he submitted to induction on January 16, 1970. He petitioned the district court for a writ of habeas corpus on the same day. He alleged that he had been illegally inducted because his local board had failed to reopen his classification and grant him conscientious objector status and, alternatively, that his local board "while purporting to refuse to reopen and consider anew petitioner's I–A classification, did *in fact* so reopen and consider the same anew but refused to grant petitioner * * * the rights of appellate review of the Board's refusal to reclassify petitioner to Conscientious Objector classification." [1]

The district court restrained the respondent Commanding Officer of the induction station from removing petitioner from the jurisdiction. After a hearing and a review of petitioner's selective service file, however, the district court denied the writ on February 20, 1970. On February 25, 1970 another panel of this court restrained respondent from removing petitioner from the jurisdiction and further restrained him from placing petitioner on any other status than "soldier on excess leave" during the pendency of this appeal.

## II

Petitioner claims that his induction order is invalid because his local board illegally refused to reopen his classification and grant him a conscientious objec-

---

1. This latter claim is without merit since we have concluded that the regulations required the local board to decide the merits of petitioner's conscientious objector claim as part of its decision whether to reopen and they provide for no administrative appeals from such decisions. See Paszel v. Laird, 426 F.2d 1169 (2d Cir. 1970); United States v. Bowen, 421 F.2d 193, 197 (4th Cir. 1970).

tor classification. The reopening of selective service classifications is governed by 32 C.F.R. § 1625.2. This regulation has recently been construed by the Supreme Court to require that "[w]here a registrant makes nonfrivolous allegations of facts that have not been previously considered by his Board, and that, if true, would be sufficient under regulation or statute to warrant granting the requested reclassification, the Board must reopen the registrant's classification unless the truth of these new allegations is conclusively refuted by other reliable information in the registrant's file." Mulloy v. United States, 398 U.S. 410, 416, 90 S.Ct. 1766, 1771, 26 L.Ed.2d 362 (1970).

The request for reopening in *Mulloy*, however, came prior to the issuance of an induction order, while petitioner's was made after he had been ordered to report for induction. In post-induction-order requests for reopening, the following proviso to 32 C.F.R. § 1625.2 is also applicable:

> "Provided * * * the classification of a registrant shall not be reopened after the local board has mailed to such registrant an Order to Report for Induction * * * unless the local board *first specifically finds* there has been a change in the registrant's status resulting from circumstances over which the registrant had no control." (emphasis added)

Since the result of this case turns on the proper application of this regulation to a post-induction-order claim for conscientious objector status, it is necessary to make a rather detailed analysis of the regulation's operation in such situations.

Initially, we point out that the regulation is quite explicit in requiring that before the local board may reopen after an induction order has been issued there must be (1) a prima facie showing of entitlement to a new classification; (2) a specific finding of a "change in the registrant's status" since the induction order; and (3) a specific finding that this change resulted from circumstances over which the registrant had no control. Thus, a local board's denial of a post-induction-order reopening claim cannot generally be upset on judicial review if the court determines that no prima facie case for a new classification was made out, or that a negative board finding on (2) and/or (3) above had a basis in fact.

Although the regulation is specific, the need to measure the validity of post-induction-order conscientious objector claims by its terms poses difficult problems of interpretation. One problem, for example, is whether a change in the registrant's beliefs can constitute a "change in status." While we recognize that there is some split in authority on this issue,[2] we think the plain language of the regulation compels the conclusion that a change in belief can be a "change in status." If a registrant is not a conscientious objector before he receives an induction order and becomes one afterwards, certainly he has undergone a change in status within the ordinary usage of those words.

A further question arises as to the amount of change in belief necessary to qualify as a change in status. Young men originally register with their local boards when they are eighteen years old. Although a registrant may have no conscientious objector leanings at all when he registers, his beliefs may later begin to evolve towards conscientious objection. The question then becomes: Does any continuation in the evolutionary process after an induction order has issued qualify as a change in status, or must all, or a substantial portion of that quantum of beliefs which now make the registrant a conscientious objector have evolved after the induction order? The difficulties with drawing such exceedingly nice distinctions are at once apparent. Nevertheless, until the reopening regulation is

2. Compare the several opinions in Ehlert v. United States, 422 F.2d 332 (9th Cir.), cert. granted, 397 U.S. 1074, 90 S.Ct. 1525, 25 L.Ed.2d 808 (1970), with United States v. Gearey, 368 F.2d 144 (2d Cir. 1966), cert. denied, 389 U.S. 959, 88 S.Ct. 335, 19 L.Ed.2d 368 (1967).

amended to make it more suitable for the conscientious objector area, we must attempt to give some meaning to the change in status requirement. We think the interpretation consistent with the statutory scheme is to require a "material" or "substantial" post-induction-order change in beliefs before the board may reopen under the regulation.

Another problem in applying the reopening regulation in the conscientious objector area is determining whether a material change or "crystallization" of beliefs can ever be "due to circumstances beyond the registrant's control." This question, of course, is one upon which psychologists and philosophers might differ. Nevertheless, it is our duty to supply an answer which the local boards can apply. At the risk of appearing simplistic, we think that we must again deal with the ordinary usage of the words in the regulation. By common definition, beliefs of conscience are always beyond one's control; one cannot *sincerely* turn his conscience on and off at will. The key question, then, to be resolved by the local boards is whether the registrant *sincerely* entertains deeply held beliefs which qualify him as a conscientious objector. See Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970).

Putting the above views together, we find that we are in substantial agreement with the interpretation of the reopening regulation recently set forth by Judge Friendly in Paszel v. Laird, 426 F.2d 1169 (2d Cir. 1970). Moreover, we agree with his conclusion that, on being presented with a post-induction-order prima facie conscientious objector claim the local board must make one of the following possible findings: (1) conscientious objection both before and after notice of induction; (2) no conscientious objection either before or after; (3) conscientious objection before but not after; and (4) no conscientious objection before but conscientious objection after. The third, of course, is a somewhat unreal situation; the fourth is the only one that permits the board to reopen.

III

Having decided on the proper interpretation of the reopening regulation in conscientious objector cases, we now consider whether it was correctly applied to petitioner's request for conscientious objector status. Petitioner summarized his beliefs on his Form 150 as follows:

> "My belief is that no human has the power or right to tell or command any other individual to kill or injure any human being. It is also my belief that killing in any form or manner is completely wrong and that there are laws of a Supreme Being which paramount [sic] those synthesized by the civil courts."

This statement was followed by a lengthy exposition of his beliefs, and the government has not disputed that these statements make out a prima facie case for conscientious objector status. The question remaining for this court, then, would ordinarily be whether petitioner's local board properly concluded that there has been no change in his status, i. e., either that (1) he was a conscientious objector both before and after the induction order, or (2) that he was not a sincere conscientious objector either before or after the induction order. Only if the board had one of the above grounds for rejection could it have legally refused to reopen petitioner's classification and, absent new evidence adverse to the claim, grant him conscientious objector status.

This leads us to the dispositive issue in this case. Petitioner's selective service file contains no statement of any reason why the board refused to reopen his classification. At oral argument of this case, petitioner's counsel directed the court's attention to several recent cases which indicate that the local board's failure to state any reason why petitioner's prima facie case was rejected vitiates the legality of his induction order. United States v. Broyles, 423 F.2d 1299 (4th Cir. 1970) (en banc); Capobianco v. Laird, 424 F.2d 1304 (2d Cir. 1970). See also

Paszel v. Laird, 426 F.2d 1169 (2d Cir. 1970); United States v. Abbott, 425 F. 2d 910 (8th Cir. 1970); United States v. Haughton, 413 F.2d 736 (9th Cir. 1969); United States ex rel. Morton v. McBee, 310 F.Supp. 328 (N.D.Ill. 1970). He urged us to adopt the rule, recently announced by the Fourth Circuit in United States v. Broyles, supra, that:

> "In any case where the board fails to disclose the basis for its decision, we risk blind endorsement of a mistake of law. Where it is clear that a *prima facie* case was established, we conclude that in conscientious objector cases, it is essential to the validity of an order to report that the board state its basis of decision and the reasons therefor, i. e., whether it has found the registrant incredible, or insincere, or of bad faith and why."

We think that the Fourth Circuit enunciated a salutary rule in *Broyles* and we adopt it as the law of this circuit.[2a] As Judge Friendly recently stated in Paszel v. Laird, supra, "Despite, or perhaps because of, the narrowness of the scope of review of actions of selective service boards, it is important for courts to know the ground upon which the board acted." The system of judicial review of administrative action requires that the court have some idea of the basis for the local board's determination. The necessity for the adoption of this rule is, we think, amply demonstrated by the facts of this case.

Petitioner's Form 150 was explicit in its statement of his beliefs. Certainly, the beliefs outlined, if sincerely held, would qualify him as a conscientious objector. The only possible grounds for rejecting his claim, then, would be finding that the beliefs are not sincerely held or that they did not undergo a material change or crystallize after the induction order.

There is nothing in the petitioner's file to indicate that his asserted beliefs are not sincerely held, and the board made no finding of insincerity. His beliefs are outlined in his Form 150 with apparent sincerity and there are no internal contradictions. A letter from a minister who knows petitioner well attests to his sincerity. Certainly the lateness of his claim cannot be used as the sole ground upon which to deny it.[3] See Capobianco v. Laird, 424 F.2d 1304, 1306 (2d Cir. 1970). Petitioner stated that his conscientious objector beliefs did not "mature" until the weeks after he returned from Europe on August 15. There is no indication in the file of any bad faith or unreasonable attempts to delay on petitioner's part, and again the board made no contrary finding.

Similarly, the petitioner's file indicates that his beliefs crystallized after the August 13 induction order. He stated that his early religious training taught him brotherhood, love and respect for others,

2a. We do not decide whether the rule should be given retrospective application.

3. The government argues that petitioner's claim is barred because he failed to comply with 32 C.F.R. § 1625.1(b) which requires a registrant to report to his local board "within 10 days after it occurs" any fact that might result in the registrant being placed in a different classification. We simply cannot find any authority either in the regulation itself or in the statute for the proposition that claims not raised within ten days are conclusively presumed to be waived. Such a holding would be another unwarranted type of delinquency regulation and would, we think, be particularly harsh in the conscientious objector area, where beliefs are frequently in an evolutionary state. The appropriate inquiry, we believe, is whether petitioner's beliefs crystallized or materially changed after the August 13 induction order.

United States v. Kroll, 400 F.2d 923 (3d Cir. 1968), cert. denied, 393 U.S. 1069, 89 S.Ct. 728, 21 L.Ed.2d 713 (1969) is not inconsistent with this view. In that case, it was admitted that registrant's beliefs crystallized several months before the induction order, and thus there was no "change in status." The court pointed out that a holding to the contrary would be "anomalous" in light of the ten-day regulation, but nowhere did it state that claims not presented within 10 days are waived.

and that in college he engaged in discussions and reading about the "meaning of life." But the primary occasion for his becoming a conscientious objector, he stated, was an extensive tour of Europe he took during the summer of 1969. Such things as the Berlin Wall and remnants and memorials of World War II destruction, he said, had a profound impact on him. Moreover, he stated that his travels through the Soviet Union, Poland, and Czechoslovakia convinced him of "the common ground of Brotherhood" with the peoples of those countries: "We were humans in dialog, not enemies against each other."

Returning to the United States on August 15 and finding the waiting induction order, he stated that he was finally forced to confront the reality of a world dominated by military force. In the subsequent weeks and months, he analyzed his European experiences, talked to his minister very frequently, and finally concluded that he could sincerely claim to be a conscientious objector.

Again, nothing appears in petitioner's file that would contradict or cast doubt upon his description of the timing of the crystallization of his conscientious objector beliefs, and the board made no finding on this issue. Why then did the board refuse to reopen his classification? We can only speculate. Perhaps, petitioner was evasive during his courtesy interview causing the board to conclude that he was insincere in his beliefs. Perhaps, the board believed him to be a sincere conscientious objector but disbelieved his account of post-induction-order crystallization. On the other hand, for all that we can tell from petitioner's file the board was completely impressed with his credibility on all issues but denied his claim because of the erroneous view that his beliefs were not sufficiently "religious" (see United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed. 2d 733 (1965); Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970)) or that beliefs are always within one's control for purposes of the reopening regulation. We simply do not know.

However, this much is clear: absent a finding of insincerity, either as to the merits or the claimed timing of petitioner's beliefs, we have no basis in fact for concluding either that petitioner was a conscientious objector both before and after the induction order, or that he was not a conscientious objector either before or after the order.

We cannot say that the board did not believe petitioner without some indication in petitioner's file as to what the board did not believe and why. The legality of an induction order must, in our view, be tested by the facts presented in the registrant's selective service file. See United States v. Abbott, 425 F.2d 910, 913 n. 4 (8th Cir., 1970). But cf. Paszel v. Laird, 426 F.2d 1169, 1175 (2d Cir. 1970). Since petitioner's file contains no statement of the reasons for the board's refusal to reopen his classification, we have no choice but to hold his induction order invalid and direct that the writ be issued.

The judgment of the district court will be reversed and the case remanded to the district court with directions to issue the writ.

ALDISERT, Circuit Judge (concurring).

I agree that this circuit should adopt the *Broyles* rule, but I do not believe its application should threaten previous determinations by local boards in the three states and the territory of this circuit. I do not read United States v. Broyles, 423 F.2d 1299 (4 Cir. 1970) or United States v. Haughton, 413 F.2d 736 (9 Cir. 1969) to be bottomed on constitutional grounds. Instead, these decisions appear to be based on the salutary desire to supply the district court with a proper record of the administrative proceedings in their review of whether the registrant has met the statutory criteria. Because of the effect such a rule would have on the administration of justice, Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18

L.Ed.2d 1199 (1966), I would remand to the district court all appropriate cases heretofore processed for further remand to the local boards to afford the boards the opportunity of explaining rejections of requests for reopenings in these cases. For cases arising hereafter, I would accept the majority's procedure whereby the legality of the induction order is tested solely by the facts presented in the registrant's selective service file.

I am also in agreement with the majority's action which, in my view, restricts severely, if not completely overrules, our previous decision in United States v. Kroll, 400 F.2d 923 (3 Cir. 1968) on the theory that 32 C.F.R. § 1625.1, which purports to impose a requirement of notifying one's local board "within 10 days after" a change in circumstances occurs, may be considered, at least as applied to conscientious objector cases, "another unwarranted delinquency regulation."

My major disagreement with the majority is the adoption by this court of the minority rule of the circuits—the Second and Tenth—that the crystallization of one's conscientious objector belief is always beyond one's control. The Fourth, Fifth, Sixth, Seventh and Ninth Circuits have held that it is a circumstance over which he has control. To resolve this conflict the Supreme Court has accepted certiorari, 397 U.S. 1074, 90 S. Ct. 1525, 25 L.Ed.2d 808, in Ehlert v. United States, 422 F.2d 332 (9 Cir. 1970).[1] And my specific quarrel with the majority action is their promulgation of a sweeping rule deciding the question of control over circumstances in all applications for reopening of classification.

In adopting this new rule for the circuit, the majority states:

> This question, of course, is one upon which psychologists and philosophers may differ. Nevertheless, it is our duty to supply an answer which the local boards can apply. At the risk of being simplistic, we think that we must again deal with the ordinary usage of the words in the regulation. By common definition beliefs of conscience are always beyond one's control.

I do not choose to enter the lists to decide whether it is the function of the judiciary, or that of Congress or the Executive to supply answers "which the local boards can apply." But I cannot bring myself to concur in an approach which, while recognizing the complexity and sophistication of a behavioral science problem, nonetheless, formulates a conclusion, under the aegis of "common definition," without discussing the specifics of a problem which has perplexed so many courts, and led to divergent conclusions.[2]

As a starting point, it has been suggested that if the acquisition of the conscientious objector belief resulted from deliberate action, then it must follow that the crystallization resulted from cir-

1. A minority of circuits hold that the crystallization of such views is a circumstance over which the registrant has no control. United States v. Sandbank, 403 F.2d 38 (2 Cir. 1968), cert. denied 394 U.S. 961, 89 S.Ct. 1301, 22 L.Ed.2d 562 (1969); United States v. Gearey, 368 F.2d 144 (2 Cir. 1966), cert. denied 389 U.S. 959, 88 S.Ct. 335, 19 L.Ed.2d 368 (1967), rehearing denied 389 U.S. 1010, 88 S.Ct. 561, 19 L.Ed.2d 611 (1967); Keene v. United States, 266 F.2d 378 (10 Cir. 1959).

The majority of circuits hold that it is a circumstance over which he has control. Ehlert v. United States, 422 F.2d 332 (9 Cir. 1970), cert. granted 397 U.S. 1074, 90 S.Ct. 1525, 25 L.Ed.2d 808 (1970); United States v. Schoebel, 201 F.2d 31 (7 Cir. 1963), with approving dicta in Davis v. United States, 374 F.2d 1 (5 Cir. 1967); United States v. Jenison, 402 F.2d 51 (6 Cir. 1968), cert. denied 394 U.S. 912, 89 S.Ct. 1024, 22 L.Ed.2d 225 (1969); United States v. Helm, 386 F.2d 434 (4 Cir. 1967), cert. denied, 390 U.S. 958, 88 S.Ct. 1045, 19 L.Ed.2d 1153 (1968); United States v. Al-Majied Muhammad, 364 F.2d 223 (4 Cir. 1966).

2. In adopting the Second Circuit's rule today we were not bound by a previous rule of decision as faced Judge Friendly in Paszel v. Laird, 426 F.2d 1169 (2 Cir. 1970), wherein he said that this subject "long the subject of debate between psychologist and philosophers, is now the law of this circuit."

cumstances within the registrant's control. William James described deliberate action as that which results when the mind has many objects before it, related to each other in antagonistic or favorable ways, creating a feeling of inward unrest known as indecision. He suggested that as long as this process lasts, with the various considerations competing for attention, we are said to deliberate. When the original suggestion either prevails and causes the movement to take place, or becomes definitely quashed by its antagonists, we are said to decide in favor of one or another course, and the reinforcing or inhibiting objects which have competed for attention are termed the reasons or motives by which the decision is brought about.[3] All deliberations, according to James, do not involve the same methodologies or cerebral intensities, but do have the common characteristic of a constant conflict of arguments for and against a given course.[4]

John Dewey and Bertrand Russell both emphasized the use of the deliberative process in making decisions. Dewey said that "[w]hile a man lives, he never is called upon to judge whether he shall act, but simply *how* he shall act. A decision not to act is a decision to act in a certain way; it is never a judgment not to act, unqualifiedly. It is a judgment to do something else—to wait, for example." [5] And Russell has asserted: "[F]ew beliefs, if any, are *wholly* spontaneous in an educated man. The more a man has organized this knowledge, the more his beliefs will be interdependent, and the more will obvious truths be reinforced by their connection with other obvious truths." [6]

But to test the crystallization of conscientious objector beliefs by the presence of deliberate thought-action is not enough. Considering the evidence—the various objects competing for attention—is a deliberate, rational, intellectual activity. As an activity, it is within one's control, and this fact is reflected in numerous phrases in ordinary language, as when we say that someone willfully refused to look at the facts. Once one has decided to consider the evidence, however, it is not clear that reaching a conclusion is to the same extent an activity within one's control. We speak of "being forced to conclude," or "being compelled by the facts" to a certain conclusion. One may be driven by the evidence or led against one's will to a conclusion. If we are rational, and honest, then we let the evidence decide for us and do not control the conclusion we will reach.

Putting aside the deliberative process in its classical sense, and turning to the broader concept of "belief", we find that formidable authorities have posed the questions: Can one really make oneself believe something, or make oneself go on believing it, just by an effort of will? Are our beliefs really under voluntary control at all? [7]

David Hume thought it quite obvious that they are not.[8] H. H. Price seemed to agree, at least to the extent of saying:

> Believing a proposition is, I think, a disposition and not an occurrence or "mental act", though the disposition is not necessarily a very long-lived one and may last only a few seconds. * * There is a characteristic sort of mental occurrence which we sometimes notice when we are in the process of *acquiring* such a disposition. I am going to call this occurrence "assenting" to the proposition. * * * When our belief is a reasonable one, this assent-

3. William James, Psychology (Briefer Course), Collier Books, 1969 Edition, 426.

4. *Id.* at 427–31. For a categorization of the chief types of decisions, see *id.* at 376–81.

5. Pragmatic Philosophy, Anchor Books Edition (1966), 232.

6. *Id.* at 313.

7. H. H. Price, "Belief and Will," Proceedings of the Aristolian Society, Vol. XXVIII (1954), 14, 15.

8. Hume, Treatise, Everyman Edition, Vol. 2, 313–14.

ing, and especially the initial assent, has a *preferential* character. * * *

Now because of this preferential element in it, assent may look like voluntary choice. But the appearance is deceptive. It is not a free choice at all, but a forced one. If you are in a reasonable frame of mind * * * you cannot help preferring the proposition which *your* evidence favours, the evidence *you* are at the moment attending to, though the evidence which other people have may of course be different. * * * It just is not in your power to avoid assenting to the proposition which the evidence [your evidence] favours, or to assent instead to some other proposition when the evidence [your evidence] is manifestly unfavourable to it.[9]

I have limited this analysis thus far to decision-making processes which involve the weighing of evidence, pro and con, in varying degrees of personal control. Not all decisions, however, are reached by an evidence-weighing procedure.[10] Professor James included as "movement consequent upon cerebromental change" expressions of emotions and instinctive and impulsive performances. "An emotion," he said, "is a tendency to feel, an instinct is a tendency to act, characteristically, when in the presence of a certain object in the environment."[11] Instinct to him was "the faculty of acting in such a way as to produce certain ends without foresight of the ends, and without previous education in the performance," and he declared that every instinct is an impulse. Bertrand Russell believed it possible for there to be a spontaneous belief. C. J. Adcock suggests that it is sometimes difficult to decide whether behavior based on emotionality results because "the immediate drive strength is overvalued and so difficult to control. The same result will obtain if the control function itself is too weak. It is very important to notice that while low ego control and high emotionality have similar effects they are

9. Price, *supra*, note 6, at 15, 16.

10. Professor Karl H. Llewellyn began his classic, THE COMMON LAW TRADITION, *Deciding Appeals*, with these words:

When the psychologists began to look into how people go about reaching decisions, the question they were concerned with was: how do people get to a decision at all, to any decision, when faced with a problem-situation out of life? Roughly, they arrive at the conclusion that if it was a true problem-situation, i. e., if it was really a puzzler, then it was seldom that the actual deciding was done by way of formal and accurate deduction in the manner of formal logic. The common process was rather one either of sudden intuition—a leap to some result that eased the tension; or else it was one of successive mental experiments as imagination developed and passed in review various possibilities until one or more turned up which had appeal. In any ordinary case a reasoned justification for the result represented a subsequent job, testing the decision against experience and against acceptability, buttressing it and making it persuasive to self and others.

11. He conceded that there may be purely cerebral emotion, *i. e.*, the so-called subtler emotions:

Such feelings as moral satisfactions, thankfulness, curiosity, relief at getting a problem solved, may be of this sort. But the thinness and paleness of these feelings, when unmixed with bodily effects, is in very striking contrast to the coarser emotions. In all sentimental and impressionable people the bodily effects mix in: the voice breaks and the eyes moisten when the moral truth is felt, etc. Wherever there is anything like *rapture*, however intellectual its ground, we find these secondary processes ensue. Unless we actually laugh at the neatness of the demonstration or witticism; unless we thrill at the case of justice, or tingle at the act of magnanimity, our state of mind can hardly be called emotional at all. It is in fact a mere intellectual perception of how certain things are to be called—need, right, witty, generous, and the like. Such a judicial state of mind as this is to be classed among cognitive rather than among emotional acts.

James, *supra*, note 2, at 392.

functionally very different." [12] And no discussion of a comparison between reason and uncontrolled action would be considered complete without a reference to Freud's analysis: "The ego represents what may be called reason and common sense, in contrast to the id, which contains the passions." [13]

Based on the views heretofore rehearsed, I am convinced that the acquisition or maturation of conscientious objector beliefs may arise from circumstances beyond one's control: when one reaches the decision by a rational process of weighing countervailing arguments in a purely objective fashion, to the end that he is compelled to a conclusion, such decision is not controlled by his will but is determined by the evidence; when one engages in an apparently rational process of evaluating the evidence but, in fact, "prefers" certain evidence favorable to an "acquired disposition," the development of a belief is, at least in part, not controlled by will; when the acquisition of belief results from emotion, instinct, or impulse, it cannot be characterized as voluntary.

On the other side, there can be little doubt that a belief may come about through the exercise of one's will and thus arise from circumstances within one's control. If one enters upon an objective process of weighing and evaluating conflicting views, scrupulously avoiding the assigning of preferential regard for certain evidence, but in the end opts for a belief without being "driven" by the evidence, or in spite of the evidence, certainly this belief cannot be characterized as involuntarily acquired.

And at the risk of being accused of undue cynicism, I must confess my own subjective inclination to examine carefully all tardy expressions of conscientious objector belief. When the public expression of this formulation first takes place after receipt of the notice of induction, I am not willing to affix to such an occurrence, as would the majority, the irrebuttable presumption that it has happened on the road to Damascus.

Accordingly, I would abjure the promulgation of a hard-and-fast rule on the "control" issue for the governance of all cases of this kind. I would hold that the crystallization of conscientious objector beliefs may be within the control or beyond the control of the registrant, depending upon the specific circumstances of his case. Each case, then, should be evaluated on its own facts.

12. Adcock, Fundamentals of Psychology, Penguin Books (1968), 212–13.

13. Freud, The Ego and the Id, Norton (1962 Ed.) 15.