**UNITED STATES of America**
**v.**
**Christian Robert MERKLE, Appellant.**
**No. 19149.**

United States Court of Appeals,
Third Circuit.

Argued Feb. 1, 1971.

Decided June 21, 1971.

Edwin H. Beachler, McArdle, McLaughlin, Paletta & McVay, and Michael Malakoff, Pittsburgh, Pa., for appellant.

Kathleen K. Curtin, Asst. U. S. Atty., Pittsburgh, Pa. (Richard L. Thornburgh, U. S. Atty., Blair A. Griffith, First Asst. U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before McLAUGHLIN and VAN DUSEN, Circuit Judges, and HANNUM, District Judge.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Registrant Merkle has appealed from a judgment and commitment dated June 24, 1970, for refusing to be inducted into the Armed Services of the United States in violation of 50 U.S.C.App. § 462(a).

On February 9, 1965, Merkle filed his filled out questionnaire. Under series 8 re conscientious objection if any, he stated "does not apply." In that same year he registered as a student in Pennsylvania State College; later he transferred to Duquesne University. He went through all of his college years with the classification of II–S (student deferment). As his undergraduate course was drawing to a close in 1968, he applied for a conscientious objector classification on March 29 and supported his application by letters filed in June 1968. In June 1968, Merkle was reclassified as I–A. He asked for a personal appearance before his local draft board which was granted. Thereafter the board classified him as I–A. He requested an appeal which was granted. The Appeal Board classified him I–A. He was given a Presidential appeal, after which he was classified I–A.[1]

We have concluded that the March 19, 1971, decision of this court in United States v. Crownfield, 439 F.2d 839 (3d Cir.), requires a reversal of the above-mentioned June 24, 1970 judgment because of a denial of the procedural principle adopted in Scott v. Commanding Officer, 431 F.2d 1132, 1137 (3d Cir.1970). The information submitted to the local board in the spring of 1968 made out a prima facie case for a conscientious objector classification,[2] and the board did not submit its reasons to the registrant as required by Crownfield, supra.

The claim for exemption on registrant's Form 150 stated:

"(B) I am, by reason of my religious training and belief, conscientiously opposed to participation in war in any form and I am further conscientiously opposed to participation in noncombatant training and service in the Armed Forces. I, therefore, claim exemption from both combatant and noncombatant training and service in the Armed Forces."

Sheets attached to the form included this language:

"I believe in a Supreme Being. * * * This Supreme Being is the Creative Force of Love, that is always at work, not only in man, but throughout all of nature. It is the love that allows one man to understand another; it is the life-force that refreshes nature each spring. * * *

"I believe that all living things are holy. Each man has infinite intrinsic worth.

"In a man, the Supreme Being is felt as love, as care. * * *

"I believe that each man is of the same Source. Life is a gift in which all men share equally. No man can presume the right over life and death of another. * * *

"Love and understanding among men are delicate; they are destroyed by violence and war. To kill another man is an act of despair and blindness. I believe that to kill another is to sacrifice love and understanding in oneself. I am not willing to do this. I cannot presume the right over another man's life.

"Because of my beliefs, I will refuse combatant and non-combatant service in the armed forces.

* * * * * * *

"Love and respect for life will always remain my ultimate references, because in them is involved my essential humanity and relatedness with all other men.

---

1. After an induction order had been mailed to him, on March 27, 1969, Merkle filed a second Form 150 under the then revised Selective Service Regulations. The local board reviewed the file, including the Presidential appeal proceedings. It reaffirmed the I–A classification. In view of Ehlert v. United States, 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625, (1971) it is not necessary to consider the merits of this second application.

2. See Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970); United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). We note that the Welsh decision was filed in June 1970, after the February 1970 trial in this case.

\* \* \* \* \* \* \*

"My religious belief has many sources, as it is, ultimately, rooted in all the experiences of my past life.[3]

\* \* \* \* \* \*

"I believe that force, when it results in the loss of human life, can never be morally justified.

"In all of my activities and relationships with people, I have attempted to make the concerns of love and respect for the individual my guiding principle. I feel that my involvement in the interracial discussion group in my senior year of high school and my voluntary involvement, continuing for a year, in the tutoring program for underprivileged children demonstrate my sincerity."

The registrant submitted three supporting letters certifying to the sincerity of his belief.[4]

The Board summary of the personal appearance hearing granted to the registrant in August 1968 includes the statement that "Registrant \* \* \* is a Catholic and belongs to no church at the present." The record before the Board makes it impossible to tell whether it and the appellate administrative authorities acted because registrant "belongs to no church," he was insincere, or for some other reason. In *Crownfield, supra*, this court stated:

"The purpose of our holding in *Scott*, as stated in that opinion, is to ensure meaningful judicial review of administrative action by requiring that the court have some idea of the basis for

---

3. At this point, the following language appears on these sheets:

"I was raised as a Catholic and attended a Catholic high school. I took the Church teachings very seriously throughout high school. However, due to my experiences as a participant, throughout my senior year, in an interracial discussion group which attempted to establish a dialogue between Negro students in the Hill District area and white students from Catholic schools, I began to think more about the problems of social justice and love among men.

"During this time I read novels of Dostoyevsky. His profound religious questioning influenced me deeply. I began more and more to question the doctrines of the Catholic Church concerning its teachings on the nature of God, the nature of man, and the justification of war. At this time, my beliefs were pantheistic; I believed that man is innately good, the evil in men being the result of their environment.

"I have read and taken courses on Eastern Religions. Taoism, an ancient Chinese religion which stresses oneness with nature and respect for life, has also influenced me recently.

"My talks with Father William Clancy, a Catholic priest who acts as a chaplain to Pittsburgh area colleges, have further influenced me in my choice to act on my religious convictions."

4. A supporting letter of May 22, 1968, from a "retired Army Officer having served in World War II" who does "not accept the philosophy of the Conscientious Objector" stated:

"1. I was impressed with his sincerity even though I disagreed.

2. He felt very strongly that his religious beliefs would be flagrantly violated by actively participating in a war.

3. To my knowledge he has felt this way for at least four years."

A letter from the registrant's father, received 6/13/68, states:

"About the time he entered high school (age 14) his abhorrence of violence and his respect for human life were further sustained by a great admiration for Albert Schweitzer. At this time he expressed a complete repudiation of capital punishment and he carried his respect for all forms of life to the point of not wanting to kill a fly.

\* \* \* \* \*

"In conclusion, while I am not in complete sympathy with Chris's belief as a conscientious objector, I fee that this beliefs are definitely sincere and deep rooted."

Father Clancy states in his letter of 6/24/68:

"I write as a Roman Catholic priest to testify that Mr. Christian Merkle has consulted me at great length on the question of his conscientious objection to all forms of modern warfare. Mr. Merkle's convictions are deeply and sincerely held. \* \* \*"

the decision of a local or appeal board. [Scott v. Commanding Officer, 431 F. 2d 1132, 1137 (3d Cir.1970).] * * * We are unwilling to blindly endorse the rejection of any prima facie conscientious objector claim—whenever made —on the basis of reasons known only to the Selective Service System." United States v. Crownfield, 439 F.2d 839, p. 842 (3d Cir.).

We note that the procedural principle controlling this case was adopted by this court in *Scott* and *Crownfield, supra,* after the February 1970 district court nonjury trial in this case and that this principle was not presented to, nor considered by, the district court at the time of its April 20, 1970, Memorandum of findings and conclusions.

Because it is impossible to know the reason for the actions of the Board and appellate Selective Service authorities, the June 24, 1970, judgment and commitment will be reversed.

GERALD McLAUGHLIN, Circuit Judge (dissenting).

Appellant Merkle was convicted of refusing to be inducted into the Armed Services of the United States in violation of Title 50, Section 462 U.S.C.

On February 9, 1965, Merkle filed his filled out questionnaire. Under series 8 re conscientious objection if any, he stated "does not apply". In that same year he registered as a student in Pennsylvania State College, later he transferred to Duquesne University. He went through all of his college years under the protection of his II–S (student classification). As that period was drawing to a close in 1968, he applied for a conscientious objector rating. In June 1968, Merkle was reclassified as I–A. He asked for a personal appearance before his Local Draft Board which was granted. Thereafter the Board classified him as I–A. He requested an appeal which was granted. The Appeal Board classified him I–A. He was given a Presidential appeal, after which he was classified I–A. On March 27, 1969 Merkle filed a second form 150 under the then revised Selective Service Regulations. The Local Board reviewed the file, including the Presidential appeal proceedings. It reaffirmed the I–A classification.

In his original 150 questionnaire Merkle said "I believe in a Supreme Being. This Being is a creative force of love." He stated he had been raised as a Catholic; that in his senior year of high school "I read the novels of Dostoyevsky. His profound religious questioning influenced me deeply. I began more and more to question the doctrines of the Catholic Church concerning its teachings on the nature of God, the nature of man and the justification of war." He said, at college "I have read and taken courses on Eastern religions. Taoism, an ancient Chinese religion which stresses oneness with nature and respect for life, has also influenced me recently."

Under the revised 150 form it was no longer mandatory for a c.o. applicant to express belief in God. Merkle eliminated that reference entirely from his 1969 form which he filed March 27, 1969.

The Seeger opinion, 380 U.S. 166, 85 S.Ct. 854 (1965) admittedly governs this appeal. Its firm base cannot be soundly denied. It held that the decisional problem there " * * * is whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God of one who clearly qualifies for the exemption." Welsh v. United States (1970), 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308, with Seeger as its guideline and, under the particular facts, adopted the language of the Ninth Circuit Court of Appeals in the case, which had concluded, with reference to the beliefs of Welsh as elaborated by him, that he held them *with the strength of more traditional religious convictions.* 404 F. 2d 1078 at 1081." (Emphasis supplied.) The Supreme Court therefore rendered its judgment that Welsh was clearly entitled to a conscientious objector exemption. The Court expressly agreed with Section 6(j) of the Selective Service Act saying "that section exempts from military service all those *whose con-*

*sciences, spurred by deeply held moral, ethical, or religious beliefs, would give them no rest or peace if they allowed themselves to become part of an instrument of war."* (Emphasis supplied.)

The record before us unmistakably shows that in his original Selective Service Questionnaire, Merkle stated that the conscientious objector part of the form did not apply to him. He put in what seems to have been a comfortable four years at college. Towards the end of that period he filed a conscientious objector application. He left the Catholic Church as such because, according to him, of its doctrines on the nature of God, the nature of man and the justification of war. It should be noted at this point that a Catholic priest was Merkle's main witness. In January 1970, that priest testified that Merkle had consulted him at great length on his conscientious objection; the priest said Merkle's convictions were "deeply and sincerely held and are based upon his understanding of the Catholic Church's position on modern warfare and his understanding of his own obligation in conscience to refuse participation in it." Despite the fact that according to Merkle, he had left his Church because of its justification of war, despite the fact that the priest must have known this, true or false as it might be, in his next sentence the priest states that "Merkle's request for a conscientious objector classification is in complete accord with the teachings of the Catholic Church. * * *" That priest testified that he was then forty-six years old. *He said he had been a priest five years.* He also stated that since 1964 (and from the trial transcript, prior to that) "I have discussed Mr. Merkle's religious development and his beliefs at great length and I hope some depth." Despite his then mentioned age it is evident that the witness was involved in said discussions certainly during the first year of his ordination or prior thereto.

From what Merkle put down in writing, Father Clancy, Dostoyefsky and Taoism were major reasons for him turning into a conscientious objector. It is passing strange that nowhere in this voluminous record is there any mention of Father Clancy ever correcting what, according to him, was Merkle's erroneous position concerning the attitude of the Catholic Church to truly conscientious objectors.

Coming to Dostoyefsky, Merkle states that he "read the novels of Dostoyefsky" during his senior high school year. He does not refer to a single one of them or a single word from any of them. In the light of the numerous extremely long, difficult novels of Dostoyefsky it is startling for a high school senior to have succeeded in reading them all in that busy school year and in this important reliance on them, making no mention of any of their titles or their language. In any event Dostoyefsky had been a soldier, had been in prison for activities against the State. As life went on for him, he wanted peace, he wanted people to be of transcendent purity and meekness, though most of his characters were demon ridden, tortured beings. A victim of epilepsy himself, Dostoyefsky, at least in his latest years, had pity for suffering humanity. There is not even an attempted suggestion by Merkle that Dostoyefsky would not have pitied the South Vietnamese whose very existence as a nation and as individual human beings was and is being destroyed by North Vietnam with the open help and cooperation of Soviet Russia and Communist China.

Finally there is Taoism. Merkle calls it "an ancient Chinese religion which stresses oneness with nature and respect for life." Had he proceeded with Taoism a little further he would have found that it was a sort of vague Chinese philosophy which taught that happiness could be acquired through obedience to the requirements of man's nature in accordance with the Tao way. Nothing was presented to his Local Board ever or in his various appellate steps including the district court hearing and this appeal, that could be twisted to charge that honest, old fashioned Chinese Taoism practitioners, if Mao Tse-tung has left any of them

alive, would not feel badly at the plight of the South Vietnamese and if free to do so, gladly help them.

In the light of all Merkle's statements about his views from last year in high school and through college it is amazing that in the summers of 1965, 1966 and 1967 which brought him up to his last college semester, Merkle worked for Mine Safety Appliance Company. That corporation for many years was a most prominent manufacturer of war materials. Its activity, including gas masks, was carried on during World War II, the Korean Conflict and throughout all of Merkle's employment.

There can be no doubt about the governing law. United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) is admittedly the key decision on which all relevant litigation on the problem "whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God of one who clearly qualifies for the exemption." Seeger p. 166, 85 S.Ct. 854. Following the later Selective Service Act of 1967, the 150 conscientious objector application eliminated the necessity of belief in a Supreme Being. On June 15, 1970 the Supreme Court in Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308, reversed the registrant Welsh's conviction "because of its fundamental inconsistency with United States v. Seeger, supra, p. 335, 90 S.Ct. p. 1794." In Welsh, the Court flatly held that "There was never any question about the sincerity and depth of Seeger's convictions as a conscientious objector, and the same is true of Welsh." p. 337, 90 S.Ct. p. 1795. The opinion of this court in Scott v. Commanding Officer Volatile, et al, 431 F.2d 1132 (1970), is in full accord with Welsh and Seeger. In our latest ruling relevant to this appeal, United States v. Crownfield, 439 F.2d 839 (1971) clearly defines Scott, stating *"The purpose of our holding in Scott, as stated in that opinion, is to ensure meaningful judicial review of administrative action by requiring that the court have*

*some idea of the basis for the decision of a local or appeal board.* (Emphasis supplied.) (*Scott*, 431 F.2d p. 1137.) \* \* \* *We are unwilling to blindly endorse the rejection of any prima facie conscientious objector claim—whenever made—on the basis of reasons known only to the Selective Service System"* (Emphasis supplied). Crownfield, 439 F. 2d 839, p. 842.

It is the fact, definitely conceded on behalf of appellant that the Selective Service decision was as is stated in the table of contents and again in the "Statement of Questions" involved, p. 1 of appellant's brief and never denied that "the Selective Service System's decision (was) that Appellant's beliefs do not occupy the same place in his life as an orthodox belief in God holds in the life of one clearly qualified for a conscientious objector exemption."

That is the Seeger test, the Welsh test, the Scott test and the Crownfield test. That is the test that the district judge categorically relied upon and quoted from the principal Seeger test for determining whether a conscientious objector's beliefs are religious within the meaning of 6(j) saying: "The test of religious training and belief might be stated in these words, A sincere and meaningful belief which occupies in the life of the possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition." That is the only "religious belief" with which the trial judge was concerned and properly so; again in quotes it is the only "religious belief" upon which the above cited opinions, the law of the land, are founded.

Appellee does not contend that for conscientious objector status Merkle must believe in God or a Supreme Being. That necessity was disposed of beginning with Seeger. On the particular appeal point we are now considering there is only one prime question before us, i. e., were Merkle's beliefs, allegedly religious and whatever they were, deeply held by Merkle with the strength of traditional religious convictions? Resolving that

question under the admitted facts was strictly a judgment decision for the lower court. There was sound justification for the trial court finding, as far as this appeal point is concerned.

It is also argued on behalf of appellant that "Congress does not have the constitutional power to discriminate between the draft status of religious and non-religious conscientious objectors." The point is plainly frivolous.

Appellant's next point is "The Local Board must state its reasons when it denies a timely filed conscientious objector claim." It is interesting that appellant's attorneys in their reply brief do not mention their theory that the Selective Service System had no basis in fact for its decision. They devote the entire reply brief to the above contention in an attempt to offer something that might seem plausible. They could not possibly forget, but chose to ignore the admissions in their main brief that the Selective Service decision was " * * * that Appellant's beliefs do not occupy the same place in his life as an orthodox belief in God holds in the life of one clearly qualified for a conscientious objector exemption." They also turn away from the district court explicit reliance upon the Seeger decision, quoted by the trial judge as I have above noted. Appellant's attorneys also conveniently avoid the latest and firm pronouncement of this court in Crownfield set out above, that for meaningful review of this type of case this tribunal is " * * * requiring that the court have some idea of the basis for the decision of a local or appeal board (and) * * * refusing to blindly endorse the rejection of any conscientious objector claim—whenever made—on the basis of reasons known only to the Selective Service System." The attorneys for appellant in their brief reveal that they had full knowledge of the reasons the Selective Service denied appellant's application. The Seeger decisional language quoted and so held by the district judge, shows that he was alert to the fundamental reason for rejection of the application and approved of it. The true situation presented on behalf of appellee United States cannot be repudiated now. To allow such repudiation would be a miscarriage of justice.

I have fully examined all the other contentions for appellant. Under the facts of this case and the law they are without merit. I would affirm the judgment of the district court.